[No. G010071. Fourth Dist., Div. Three. Feb. 28, 1992.]

MALCOLM MORGAN, Plaintiff and Appellant, v.
UNEMPLOYMENT INSURANCE APPEALS BOARD, Defendant and
Respondent.

**COUNSEL**

Malcolm Morgan, in pro. per., for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, Robert L. Mukai, Chief Assistant Attorney General, Charlton G. Holland III, Assistant Attorney General, Anne S. Pressman, John H. Sanders and Richard T. Waldow, Deputy Attorneys General, for Defendant and Respondent.

**OPINION**

**SONENSHINE, J.**—Malcolm Morgan appeals a ruling by the trial court affirming a decision by the Unemployment Insurance Appeals Board (Appeals Board), which denied him unemployment insurance benefits. The

original ruling had been made by the California Employment Development Department (EDD), upheld by an administrative law judge (ALJ) and affirmed by the Appeals Board. Morgan contends the reason given for leaving his place of employment—he was "laid off"—was not a false statement. He also insists he was denied due process during the hearings.

I

Morgan, a Honeywell employee, received a written warning letter from management in January 1989, informing him of the instances in which he was not meeting the company's expectations. Apparently having failed to reform, he received a second notice on the 1st of March, stating he would be terminated by April 1 if there was no improvement.

Deciding termination was imminent, Morgan spoke with the personnel manager, Diane Flanagan. He was in the midst of the application process for a new mortgage on his home, and he feared the new loan would fall through if there was a hint of his being discharged. He therefore negotiated with Flanagan for a full six weeks of employment, in exchange for which he would resign his position as of April 14. It was later agreed that Flanagan would not inform inquiring prospective employers of the circumstances of Morgan's leaving Honeywell.

· Friday, April 14, was Morgan's last day at Honeywell. He filed for unemployment benefits effective the 16th, checking the box, "Laid Off Due to Lack of Work," for the reason he was no longer at his last jobsite. The local Honeywell office did not respond when it received an EDD copy of his request for benefits. However, when the head office in Ohio was contacted, it replied that Morgan had not been laid off but had quit his position. When questioned directly by the EDD, the local office agreed.

Morgan was notified in June that he was ineligible for the benefits he had requested and was receiving, because of his false statements on the form.[1] A notice of overpayment was attached and he was informed of his right to appeal the ruling.

In July, Morgan appealed. The notice of hearing issued by the ALJ's office listed the issues as (1) whether Morgan voluntarily left without good cause

---

[1]The notice stated, in pertinent part: "You quit your last employer for personal reasons. It therefore must be held that the quit was without good cause. . . . When you filed your claim . . . you stated laid off. Evidence indicates that you knew or reasonably should have known that this statement was incorrect because you quit. You have not shown that this misstatement of material facts concerning your eligibility was for purposes other than to obtain benefits."

or was discharged for misconduct;[2] (2) whether he made a false statement in order to obtain unemployment benefits; (3) whether he is liable for repayment of benefits; and (4) whether the overpayment resulted from a false statement.

The ALJ affirmed the EDD ruling; the ALJ decision and its basis were independently examined by the Appeals Board, which adopted the ALJ's conclusions. Morgan then sought relief in the superior court, pursuant to Code of Civil Procedure section 1094.5, subdivision (c). His petition was denied.

## II

■ Morgan contends the evidence will not support a finding that he voluntarily quit his position, rather than being discharged by Honeywell. ■ A determination of this issue hinges upon "who was the moving party in the termination," pursuant to Precedent Benefit Decision No. 382 (P-B-382).[3]

"If the claimant left employment while continued work was available, then the claimant is the moving party. On the other hand, if the employer refuses to permit an individual to continue working, although the individual is ready, willing and able to do so, then the employer is the moving party." (P-B-382, p. 3.)

■ Here, Morgan was given two warning notices. However, rather than conform to the requirements stated therein, he chose to request the right to resign, in exchange for guaranteed employment through April 14. This latter arrangement was purely for his own benefit, a subterfuge to forestall the loss of a loan on his house. Nonetheless, the company agreed.

We note that the Appeals "Board has held that dissatisfaction with a supervisor or co-worker is generally not good cause for quitting a job . . . . [And] mere resentment at a new supervisor and a feeling by the claimant that such supervisor was insensitive are not enough to spell out good cause." (P-B-382, p. 8.)

Flanagan testified the company would probably have fired Morgan in any event. This, however, is insufficient to overcome Morgan's resignation

---

[2]The "discharge for misconduct" language was stricken. We do not address this issue, despite Morgan's claim the EDD intentionally included this allegation to create "a bad guy image."

[3]Each level of determination and reconsideration in this matter, including the petition for writ of mandate in superior court, referred to and relied upon prior decisions of the Appeals Board. Termed Precedent Benefit Decisions, they are referenced by number, preceded by the initials P-B. Succeeding citations will be so noted.

before the company took any affirmative action. "In Benefit Decision No. 5531, we held that the claimant did not have good cause for leaving, stating, 'It appears that the claimant left because he anticipated being discharged due to his failure to produce any business during a two weeks' period following the receipt of a letter of criticism from his employer. Although the claimant might reasonably have assumed that the employer would eventually terminate his service for unsatisfactory performance if he continued to make no sales nevertheless it is clear in the instant case the claimant was the moving party . . . . [T]he employer had taken no definite steps to discharge him . . . .' [¶] [Here,] the claimant voluntarily submitted her resignation prior to affirmative action by the employer . . . ." (P-B-228, pp. 3-4.)

And the most compelling evidence came from Morgan himself. At the hearing before the ALJ, Morgan testified, "I approached the company, personnel department and my supervisor and made a deal with them, and the deal was that I would go quietly if they gave me 6 more weeks of employment. I figured by that time the mortgage company would have approved my loan and etc., and I would have been okay. As it turned out, the mortgage company did approve my loan and I got the house, so that took care of that problem."

Continuing, Morgan stated, "Now, as time grew closer to be terminated or to leave, the second question came up and that was, what was I going to say to prospective employers. If I said I was—I quit, that would have [needed] an explanation. I would have had to go into a long explanation and employers do not want to hire people who have complicated things and may not have understood it anyway. So I thought the better choice was to say that I was laid off. I then talked to the personnel department, Diane Flanagan, and we made an agreement that if anybody called, employer, prospective employer, we—they would say that I was laid off."[4]

And the following remarks were made by Morgan, in response to a question by the ALJ: "But, in fact, you weren't laid off for lack of work were you?

"A   I just stated the reason.

"Q   I know, and in listening to your explanation, it appears to me that you weren't laid off for lack of work. You quit but advised prospective

[4]Flanagan testified for Morgan at the ALJ hearing: "As I recall I said to Malcolm that we would not give him any type of bad reference . . . dispute anything that he had indicated to prospective employers. At the time we really weren't thinking of unemployment. I hadn't planned to misstate. I think it was a miscommunication, frankly in terms of unemployment. I had indicated to Malcolm that I would not contest unemployment . . . ."

employers that you were laid off because you felt it would be better for a rehiring situation.

"A   That's right. And that's the agreement that I made with the company. As far as I was concerned, that was the agreement and that's the way it stood."

■   " 'In reviewing the trial court's ruling on a writ of mandate, the appellate court is ordinarily confined to an inquiry as to whether the findings and judgment of the trial court are supported by substantial, credible and competent evidence.' [Citation.]" *(Sanchez v. Unemployment Ins. Appeals Bd.* (1984) 36 Cal.3d 575, 585 [205 Cal.Rptr. 501, 685 P.2d 61].)   ■   There is ample evidence to support the decision by the EDD and affirmances by the ALJ, the Appeals Board and the trial court. Morgan voluntarily severed his relationship with Honeywell without good cause.[5] And, as noted by the trial court, Morgan's own citation supports this conclusion, "for it recognizes that the Board will not tolerate an applicant's 'unreasonable belief' in the terms of departure or a 'collusive' plan in regard thereto. That is just what [Morgan] seeks here."

### III

Morgan cites a laundry list of alleged due process violations by the EDD.   ■   He first claims the "little folder" he received prior to the ALJ hearing was defective because it failed to inform him he had a right to counsel. Untrue.

The document entitled "Appeal Information," which Morgan freely admits he received and read, provides, in pertinent part: "You have the right to have a representative present, and you can have anyone you choose. *Free legal services may be available in your community.*" (Italics added.) A separate paragraph outlines a claimant's rights at the hearing. Number 2 on the list is: "To be represented by a representative of his/her own choosing." Moreover, Morgan's application for the hearing contains a specific section for the signature of "Appeals Filed by an Attorney . . . ." He left that section blank. He has not seen fit in any subsequent hearing, including this appeal,

---

[5]Morgan claims the second warning letter contained a definite final date for his discharge. First, the letter was not introduced by him at the initial administrative hearing, making the later refusals to accept it, as evidence, proper. Second, the trial court, although refusing to accept it, noted it would make no difference in its ruling. We agree. The letter does not set a finite date. It merely identifies the areas of *continuing* concern to his supervisors, outlines in detail their expectations, and states, "Your failure to show significant improvement will result in your termination on or before April 1, 1989." Morgan chose not to comply with the company's outline, choosing instead to resign.

to hire an attorney. We conclude he understood his rights and chose to represent himself.[6]

■   Morgan also states he was not made aware of the existence of Precedent Benefit Decisions. We know of no authority requiring this announcement. Nonetheless, the information given to him provides in large print: "APPEALS BOARD INTERPRETATIONS OF THE LAW ARE AVAILABLE DURING WORKING HOURS AT ALL OFFICES OF APPEALS." He again chose not to avail himself of this service.

■   He next objects to being given but 10 minutes "to examine the principle [sic] evidence." He fails to tell us what evidence required further examination. The list of exhibits presented to the ALJ were, save one, all either generated by Morgan or sent to him in the ordinary course of reaching the hearing date.[7] The only item he had not seen before was a one-page record of the EDD clerk's telephone conversation with the Ohio representative and with Flanagan. And this document was specifically introduced *only* for showing the basis for denying Morgan's benefits, *not* for the truth of the matter asserted. He had ample time to view and digest the "evidence." And, at the commencement of the hearing, the ALJ stated, "Now, Mr. Morgan, prior to going on the record, you were given an opportunity to read the file and I explained to you what the issues were and how I would conduct the hearing. Do you have any questions about that before I swear you in to take your testimony?" Morgan replied, "No, I don't."

■   Last, Morgan laments the Appeals Board's refusal to allow introduction of new evidence, which he claimed the "ALJ had, de facto, not admitted." First, there is nothing in the transcript of the ALJ hearing indicating he *tried* to introduce any other evidence. Second, he was informed, prior to the ALJ hearing, that he "should bring *all* documents which would support [his] position . . . ." And, later in the same notice, he was told, "If there are any witnesses or documents relating to your case, *bring them to the hearing*." (Italics added.) Pretty clear. And third, he is apparently referring to the two warning letters received from Honeywell. As noted *ante*, no different result would follow had they been introduced (and the trial court

---

[6]The existence of another pamphlet, which he insists was more explicit but which was not made available to him until later, is of no moment. He cites only to a cover page, with no further material; and the one he did receive was sufficient in any event.

[7]Those documents were: notice of hearing, Morgan's letter of appeal, the EDD's notice of determination and overpayment, Morgan's initial claim form, and the department's notice of claim filed and computation of benefit amount.

examined them in any event); the second one is, in fact, detrimental to his position. We find no lack of due process afforded to Morgan in any of the hearings.

Judgment affirmed.

Sills, P. J., and Crosby, J., concurred.

A petition for a rehearing was denied March 12, 1992, and appellant's petition for review by the Supreme Court was denied May 13, 1992.